In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3462

STEVEN ARNOLD,

*Plaintiff-Appellant,*

*v.*

JO ANNE B. BARNHART,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No.05-C-006-S—**John C. Shabaz**, *Judge.*

ARGUED JULY 12, 2006—DECIDED JANUARY 16, 2007

Before COFFEY, RIPPLE, and SYKES, *Circuit Judges.*

COFFEY, *Circuit Judge.* Steven Arnold applied for
Disability Insurance Benefits and Supplemental Security
Income, claiming that his speed at performing tasks and
his ability to cope with stress are impaired from brain
damage he received at the time of his 1986 motorcycle
accident. He also claimed that due to his accident he is
prone to seizures and suffers from impaired short-term
memory and headaches. The Social Security Administra-
tion (SSA) denied Arnold's application after a hearing
before an Administrative Law Judge (ALJ), who concluded
that Arnold was not disabled because he retains the
residual functional capacity to perform several jobs in the
Wisconsin area including machine cleaner, cleaner and
polisher, electro-cleaner, and steamer. Arnold appeals the

district court's decision upholding that determination. He contends that the ALJ's decision is not supported with substantial evidence and that the ALJ failed to determine the credibility of four lay witnesses; failed to follow the requirements of SSR 96-7p when determining the plaintiff's credibility; and failed to give proper weight to the opinion of the examining psychologist, Dr. Hoffman. We affirm.

## I.

Arnold was 40 years old at the time of his hearing before the ALJ. He graduated from high school in 1979. Afterwards he completed a technical program in automotive maintenance, although he was unsuccessful at gaining employment in an automotive-repair shop. During the seven year span between his high school graduation and his motorcycle accident in 1986, he worked seasonally as a "pulp cutter," splitting timber with a chainsaw, and his annual earnings were anywhere from $1,400 to $6,000.

At the time of the accident Arnold was 25 and riding his motorcycle without a helmet. He sustained closed-head injuries as a result of his being thrown from his motorcycle to the pavement. After undergoing brain surgery he demonstrated memory problems but achieved "excellent improvement" during his six weeks of rehabilitation according to his treating psychologists. Upon discharge Arnold had regained what the attending psychologists thought was "close to his pre-morbid range of cognitive/intellectual abilities." Three years later, though, he began experiencing auras,[1] which were followed on two

---

[1] An "aura" is defined as:

An unusual sensation that is often a warning of an impending migraine headache or a seizure, a sudden episode
(continued...)

separate occasions by "grand mal" epileptic seizures, resulting in his uncontrollably and violently jerking his body. Arnold visited the emergency room after the second seizure and was prescribed Dilantin, a seizure-control medication. Emergency room tests at that time showed some softening and atrophy of his temporal lobes, and doctors advised him that he might continue to have seizures until the healing process had run its course. Arnold received no further medical or psychological treatment after 1989 because he lacked funds to pay for health care or medical insurance, and he also stopped taking seizure-control medication some time in the early 1990's because "it did not agree with [him]."

In 2000 Arnold applied for disability benefits, claiming that the suffering he endured from his head injury caused him difficulty when called upon to concentrate and when required to do so under pressure, which in turn brought on nervous headaches that he feared could precipitate a seizure if he did not take a break. Psychologist Marcus Desmonde examined him at the request of the SSA. Tests performed by Dr. Desmonde confirmed a mild to moderate "amnestic disorder," or memory impairment.

---

[1] (...continued)
of uncontrolled electrical activity in the brain, causing a series of involuntary muscle transactions or a temporary lapse of consciousness. An aura may consist of a strange feeling, abnormal perceptions, or visual disturbances such as seeing stars or flashes. For example, preceding the onset of migraine pain, a person may experience a tingling sensation or see zigzagging lights. When it precedes a seizure, an aura may help identify the seizure's focal point in the brain. It is important to diagnose and treat the underlying disorder that is causing the auras.

Am. Med. Ass'n, Complete Medical Encyclopedia, 210 (Jerrold B. Leinkin & Martin S. Lipsky eds., 2003).

Dr. Desmonde thought that Arnold's long absence from the work-force *might* interfere with his ability to tolerate "the stress and pressure of full-time, competitive employment" and to interact appropriately with others. But Dr. Desmonde concluded that Arnold could understand and follow simple instructions and carry out tasks with reasonable persistence and pace. In addition, two state psychologists jointly reviewed his medical record and concluded that Arnold was "not significantly limited" in most work-related areas, including his ability to work with others. Though characterizing him as "markedly limited" in understanding, remembering, and executing detailed instructions, the psychologists opined that Arnold could handle "basic work stress."

In administrative filings and his testimony before the ALJ, Arnold related the effect of his impairment on his work and other daily activities. He had continued to work seasonally as a full-time pulp cutter for five years after his accident (including two years after the onset of his seizures). The range of his yearly earnings following the accident varied between $1,300 and $4,900 and roughly matched the range of his earnings before the accident—$1,400 to $6,000. In 1990, during the off-season for cutting pulp, he had attempted to work full-time as a meat packer and as an auto mechanic, but had to quit both jobs after one week because he would get tired and experience headaches from being "pushed [too] hard." After 1991 he stopped returning to the seasonal work of cutting pulp and explained that he gave up trying to work for others because he could not handle the long hours without frequent breaks and the pressure to produce on a schedule.

Arnold testified that since approximately 1988, he has worked for himself, repairing the automobiles of friends and neighbors in his mother's garage. His business grew by word of mouth—according to the records he kept, he

took in only $700 from repairs in 1993, but earned between $2,000 and $3,000 each of the subsequent years. He could do anything from an oil change, to a brake repair, to an engine overhaul on cars without fuel injection. He usually worked up to five hours at a time at repairs without getting tired and on occasion would work two five-hour shifts in one day to get a job done. Nevertheless, he averaged just 50 to 60 hours of paid work per month due to down times in business.

Arnold testified that he slept eight hours a night and took a nap daily of about one hour. He played computer chess, owned and maintained his own car, which he drove when shopping for groceries. He did some household chores, although he would tire after about an hour of vacuuming or sweeping and then rest for an hour. Arnold testified that he continued to experience auras approximately once a month and was forced to lie down for several minutes when they occurred to avoid a seizure. He was not sure when he last had a seizure, although he *thought* he had at least one in the five years before his hearing. However, he added that, if the most recent event was a seizure, it had been "milder than the other ones I had earlier, because I think it's finally healed up here." To avoid nervous headaches, seizures, and angry outbursts, he said, he worked at a slow pace, taking breaks whenever he felt pressured, and taking a day off every couple of weeks. When pressured, he explained, he sometimes lost his temper and cursed out loud, occasionally while in the company of others.

Four of his neighbors wrote letters to the SSA in support of Arnold's application, and two of them appeared at his hearing and testified. They generally agreed that Arnold had attained a remarkable degree of success in coping with his impairment, but only by rigidly structuring his life to avoid stress. Crucial to that success, in their opinions, was his ability to "walk away" from stressful

situations as often and for as long as he deemed necessary. And although he got along well with those he knew, they doubted his ability to behave appropriately with strangers in a work setting. They added that "very rarely" would he display an angry outburst. All four volunteered that Arnold could not work in any competitive employment setting due to deficits in his memory, concentration, and his lack of ability to cope with stress.

A psychologist, Dr. Mary Louise Stevens, testified at the hearing as a medical expert, after Arnold conceded that she was qualified to give opinion testimony concerning his medical condition. She based her opinion on the medical records of Arnold's treatment following his accident and Dr. Desmonde's report of his current examination—but not the lay testimony of his neighbors, which she deemed to be "subjective." Dr. Stevens stated that her opinion was tentative, however, because Arnold had not seen fit to undergo a complete neuropsychological evaluation in the past eleven years, thus she recommended a current neuropsychological evaluation.[2] Based on the records from twenty years ago documenting his dramatic recovery during his hospital stay following the accident, Dr. Stevens opined that Arnold's impairment fell short of meeting a listed impairment at the time of his discharge. Although Dr. Stevens never personally examined Arnold, she reviewed all the available records and had an opportunity to observe his conduct during the administrative hearing and tentatively concluded that during the

---

[2] Over Arnold's objection, the ALJ ordered a psychological evaluation rather than the more-detailed neuropsychological evaluation suggested by Dr. Stevens. But after reviewing the psychological evaluation, Dr. Stevens came to the conclusion that she no longer felt a more detailed evaluation was necessary. Arnold nevertheless reiterated the objection in the district court, but has abandoned it on appeal.

period for which he was seeking benefits Arnold was able to perform simple, repetitive duties with low production standards while in a low-stress environment. She acknowledged Dr. Desmonde's comment that Arnold might have some difficulty tolerating work stress, and commented that her assessment specifically took that limitation into account by restricting him to low production standards and a low-stress environment.

Finally, a vocational expert testified that a person with the limitations described in Dr. Stevens's tentative opinion could work full-time as a pulp cutter or as one of several types of cleaners, such as a machine cleaner, cleaner and polisher, electro-cleaner, or steamer. If Arnold was required to take precautions to avoid job-related injuries caused by seizures, several thousand cleaner positions would still remain available in Wisconsin. On the other hand, as Arnold's counsel inquired, if the individual had to take 15 to 30 minute breaks frequently throughout the day, he would be unemployable.

After the hearing on May 1, 2001, psychologist Dr. Robert Hoffman examined Arnold and administered an intelligence test at the request of the ALJ. Dr. Hoffman submitted a written report to the ALJ that confirmed Dr. Desmonde's diagnosis of an amnestic disorder, but noted that Arnold's overall intellectual performance was significantly improved from the 1986 testing. Arnold's processing speed was in the bottom two-percent of his peers, therefore Dr. Hoffman opined that he was "generally slow at any task, diligently coping with his disability via reductions in speed." Arnold's counsel told Dr. Hoffman that Arnold's neighbors reported that Arnold occasionally displayed outbursts of anger, and on that basis Dr. Hoffman opined that Arnold had "marked limitations" in "respond[ing] appropriately to work pressures in a usual work setting." The ALJ sent Dr. Hoffman's report to Dr. Stevens for her opinion on whether it altered the

tentative opinion she gave at the hearing. Dr. Stevens responded stating that her opinion was unchanged, and further noted that Dr. Hoffman's report satisfied her as to the accuracy of her initial conclusion that Arnold could perform simple, repetitive tasks with low production in a low-stress work environment.

At the outset of his decision, the ALJ found that Arnold met the insured status requirements of the Act only through June 1994. In concluding that Arnold was not under a disability prior to that time, the ALJ followed the familiar five-step inquiry. *See* 20 C.F.R. § 404.1520. In the first step the ALJ considers the applicant's present work activity. *See id.* § 404.1520(a)(4)(I). Second, the ALJ weighs the severity of the applicant's impairment. *See id.* § 404.1520(a)(4)(ii). The impairment or combination of impairments must significantly restrict an applicant's physical or mental ability to perform basic work activities or an ALJ should enter a finding of not disabled. *See id.* § 404.1520(a)(4)(c). Third, the ALJ decides whether the impairment or combination of impairments meets or equals an impairment listed within the regulations which are conclusively disabling. *See id.* § 404.1520(a)(4)(iii). If an ALJ is unable to make a disability determination in the first three steps, then the process proceeds to an assessment of the applicant's residual functional capacity (RFC). *See id.* § 404.1520(a)(4)(e). At the fourth step, the ALJ determines whether the RFC prevents the applicant from performing his or her past relevant work. *See id.* § 404.1520(a)(4)(iv). If not, in the fifth and final step the ALJ uses the assessment of RFC to determine if the applicant can make an adjustment to other work based on the applicant's age, education, and work experience. *See id.* § 404.1520(a)(4)(v). In the last step, the burden is on the Commissioner to demonstrate that the applicant is capable of performing other work "in the national economy." *Butea v. Apfel*, 173 F.3d 1049, 1054 (7th Cir. 1999).

Applying the five-step inquiry in this case, the ALJ initially found that Arnold had not engaged in substantial gainful activity since his alleged onset date of October 1988. This was two years after the accident and one year before he began experiencing epileptic seizures.[3] Second, the ALJ found that Arnold had been severely impaired by an organic mental disorder resulting from his brain injury. Third, the ALJ concluded that Arnold's mental impairment did not meet an impairment listed in Appendix l, Subpart P, Regulation No. 4. At steps four and five the ALJ found that Arnold had no past relevant work but had the residual functional capacity to perform other jobs available in the region. Although Arnold maintained that he was unable to work without frequent breaks due to deficiencies in concentration, persistence, and pace, the ALJ concluded that such a limitation was inconsistent with the medical evidence and with Arnold's ability to work for several hours repairing automobiles.

## II.

On appeal, Arnold challenges the ALJ's finding at the fifth step of the evaluation process where the ALJ found that Arnold has the residual functional capacity to perform other jobs in the economy. He maintains that he cannot handle stress in the workplace and that, based on his experience servicing friends' cars in his mother's garage, he needs to take frequent rest breaks.

Initially, the plaintiff argues that the ALJ should not have disregarded the statements of his four neighbors. The neighbors corroborated Arnold's testimony that he only

---

[3] Due to a typographical error, the ALJ's decision says that Arnold's alleged onset date of disability is October 1998. The correct year, 1988, was clear at the hearing.

had the stamina to work for short periods and that he walked away from stressful situations. The ALJ wrote that: "third parties testified that [Arnold] is unable to stay on tasks, unable to handle stress, and withdraws when he reaches his stress limit." In Arnold's view, the ALJ failed to evaluate the credibility of this lay testimony before rejecting it. A review of the record demonstrates that the ALJ did not wholly reject the neighbors' observations; but, he did recognize the limited significance of such testimony. The only material issue was whether Arnold's impairment made the rest breaks psychologically and medically necessary. Basing his determination on the opinion of Dr. Stevens, a medical expert, the ALJ found that Arnold's breaks were not medically necessary. The four neighbors, two of whom had experience with brain injured people,[4] but none of whom were health care professionals, were not competent to refute the professional medical testimony. *See Crawford v. Comm'r of Soc. Sec.,* 363 F.3d 1155, 1160 (11th Cir. 2004) (evidence

---

[4] Arnold suggests that the ALJ should have credited the lay opinions rather than those of the doctors because the neighbors had "extensive professional experience dealing with disabled individuals and [one] in particular had extensive experience working with brain injured people." While one neighbor testified that he had worked in special education administration for twenty years and "interacted in one way or another . . . with probably 500 people with brain injury," and the other testified that he had been the Director for Senior Housing and Handicapped Housing for Catholic Charities for approximately twenty years, neither neighbor's experience qualified either of them to render a medical opinion. *See* 20 C.F.R. §§ 404.1527(a)(2) (defining "medical opinions" as statements by "acceptable medical sources"), 404.1513(a) (medical sources include physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists). Arnold concedes that neither was proffered as an expert.

submitted by petitioner was not from an "acceptable medical source" and so could not establish existence of an impairment); *Blum ex rel. Golay v. Comm'r of Soc. Sec.,* 348 F.3d 124, 126 (6th Cir. 2003) (same); 20 C.F.R. § 404.1513(a).

Next, Arnold complains that the ALJ failed to follow the requirements of Social Security Ruling 96-7p, which outlines how an ALJ should go about assessing a claimant's credibility when his allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable. In a case such as this, the claimant offers medical evidence that he suffers from a condition that might give rise to disabling symptoms but, because of the subjective nature of the symptoms, the ALJ's finding of severity depends on the claimant's testimony. The plaintiff points out that Ruling 96-7p requires that the ALJ make a finding on whether Arnold's statements concerning his symptoms and their functional effects are credible. If his statements about his pain or other symptoms are not substantiated by objective medical evidence, SSR 96-7p requires the ALJ to consider all of the evidence in the case record, including any statements by the individual and other persons concerning the claimant's symptoms. *See* 20 C.F.R. § 404.1529; Social Security Ruling 96-7p. Because the ALJ found that Arnold's limitations could be accommodated without the need for frequent breaks, Arnold claims that the ALJ did not properly credit his testimony.

Ruling 96-7p directs that an ALJ's evaluation of the credibility of a claimant:

> must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's state-

ments and the reasons for that weight . . . . It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered . . . [nor is it] enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

*Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001) (internal quotation marks and citations omitted); Social Security Ruling 96-7p. Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record. *Carradine v. Barnhart,* 360 F.3d 751, 764 (7th Cir. 2004) (Coffey, J., dissenting). In addition:

the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record.

*Id.* at 775 (quoting Social Security Regulation 96-7p). Credibility determinations will not be overturned unless they are clearly incorrect. *Zurawski,* 245 F.3d at 887; *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). As long as the ALJ's decision is supported by substantial and convincing evidence, it deserves this court's deference. *Sims v. Barnhart,* 442 F.3d 536, 537 (7th Cir. 2006).

The record demonstrates that the ALJ did not totally disregard Arnold's account of his symptoms or their effects. According to Arnold's testimony, when he was under stress or pressure, he suffered from headaches and could become frustrated, tired, or even angry. He managed these conditions by interrupting his work to rest. The ALJ found this testimony believable, but after considering and weighing

all the evidence, rejected Arnold's claim that his preferred means of coping with his symptoms—taking frequent breaks—was medically necessary. The compelling medical evidence presented clearly established that frequent breaks were not medically necessary and that any difficulty that Arnold had in dealing with stress was accommodated by his restricting his employment to low-stress work.

The ALJ properly relied on objective medical and other evidence that sufficiently contradicted the credibility of Arnold's claims of disability. Based upon the neutral expert medical testimony of Dr. Stevens, the ALJ found that Arnold was capable of performing "simple, repetitive, low production, low stress work tasks." The ALJ also found that Arnold's own disclosure of his daily work activities demonstrated that he had only mild restrictions on his daily activities and mild to moderate difficulties in maintaining concentration, persistence, or pace. Furthermore, the ALJ considered Arnold's prior work and wage earning history[5] and the testimony of lay persons regarding his ability to stay on task and to handle stress. On balance, the ALJ concluded that: "[t]he claimant's subjective complaints and functional limitations are inconsistent with the record as a whole." Thus, it is clear to this court that the ALJ gave sufficient deference to Arnold's subjective claims in light of the record as a whole to satisfy the requirements of Social Security Ruling 96-7p.

Finally, the plaintiff argues that the ALJ should have given more weight to a single observation by a psychologist, Dr. Hoffman, that Arnold's angry outbursts showed a marked limitation in his ability to respond appropri-

---

[5] As related above, the record shows that, both before and after his accident, Arnold worked as a seasonal pulp cutter. He earned between $1,400 and $6,000 annually before the accident and between $1,300 and $4,900 after the accident.

ately to pressures in a work setting. He based this observation not on medical tests but on a report of Arnold's counsel that Arnold occasionally displayed angry outbursts. The plaintiff himself testified that his outbursts of anger were triggered by stress. Nevertheless, another expert, Dr. Stevens, was of the opinion that a work limitation involving low production standards and a low-stress environment accommodated the limitation noted by Dr. Hoffman. Her conclusion was supported by two state agency psychologists who believed that Arnold could cope with "basic" stress and was not limited in his ability to work with others. Because Dr. Hoffman's opinion was in conflict with the more convincing opinions of the other medical experts, the ALJ was entitled to disregard it. *See White v. Barnhart,* 415 F.3d 654, 658 (7th Cir. 2005); 20 C.F.R. § 404.1527(d)(2).

AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*