In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1295

JOHN E. BERGER,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06-C-0256-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED NOVEMBER 8, 2007—DECIDED FEBRUARY 8, 2008

Before EASTERBROOK, *Chief Judge,* and FLAUM and
KANNE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff-appellant, John Berger,
appeals the Commissioner of Social Security's denial of
disability benefits for his back impairment. After the
Commissioner's denial, Berger sought review in the
district court, arguing that the ALJ misread the medical
evidence and unjustifiably discounted the credibility of
his testimony. The magistrate judge, in a well-reasoned
and comprehensive opinion, recommended affirming the
Commissioner's denial. The district court then adopted
the magistrate's recommendation, and this appeal fol-
lowed. Finding no error, we affirm.

## I.  Background

### A.  Factual History

John Berger, a Wisconsin native, is a carpenter by trade with the equivalent of a high-school education who, in January 1999, began experiencing pain in his left leg, left foot, and back after he took a fall at work. In August 1999, Berger visited a neurologist, Dr. Ahmad Haffar, to have his back examined. After an MRI, Dr. Haffar determined that Berger probably had a herniated disc at the bottom two segments of his lower lumbar (L4-L5) with impingement on the nerve root and narrowed discs at the top four segments of his lower lumbar (L1-L4). In layman's terms, this meant that Berger had suffered some damage to the part of his back that handles flexion, or the movement of the back. The disc between the last two vertebrae in his lower back (L4-L5) had been damaged, causing it to swell and stick out. When the disc moved—whether during lifting, bending over, or twisting—it pressed on a nerve in Berger's back, causing significant pain. Four other discs in his lower back (L1-L4) had narrowed, bringing the vertebrae closer together and similarly causing pain during movement. Dr. Haffar gave Berger an epidural steroid injection, but it did little to stop the pain. So Dr. Haffar referred Berger to a neurosurgeon, Dr. K.S. Paul, for further evaluation.

In November 1999, Berger reported to Dr. Paul that he was experiencing continuing and near-constant pain in his lower back and leg, as well as tingling in his left foot and leg. Berger said that he felt pain nearly all the time, but physical activity made it worse. After some tests, Dr. Paul noted that Berger walked with a limp and could only raise his left leg 30 degrees and his right leg 60 degrees, but he otherwise had normal strength and tone. A myelogram (an X-ray of the spine and the spaces between the spinal column after the patient is injected

with a special dye) and a CT scan confirmed the herniated discs at L4-L5 and the compressed nerves. Based on these findings, in January 2000, Dr. Paul recommended back surgery. But Berger's worker's compensation carrier denied his request, and he did not have either the money or the insurance coverage to pay for the surgery himself.

Around roughly the same time, Berger suffered a second injury at work while trying to move a wall frame, and he sought treatment from Dr. Christal Sakrison, a general practitioner. To ease his back pain, Dr. Sakrison prescribed Vicodin and a muscle relaxer. Apparently this didn't sufficiently address the pain because after his December 10, 1999 appointment Dr. Sakrison told Berger to stop working pending physical therapy and further evaluation. Over the next two weeks, Berger underwent four sessions of physical therapy and performed home exercises to strengthen his back. Later that month, a functional-capacity evaluation indicated that Berger could perform light work, meaning occasionally climbing stairs, walking, crawling, performing trunk rotations and bending.

In January 2000, Berger saw a third doctor—Dr. Stephen Weiss, an orthopedic surgeon—for an evaluation related to his claim for worker's compensation. Dr. Weiss described Berger as walking with a normal gait with moderate muscle spasms and tenderness in his lower back. He noted that Berger had a restricted range of motion in his lower back and a somewhat limited ability to lift his left leg. Based on all this, Dr. Weiss concluded that Berger should not perform work that required extensive lifting, such as lifting anything from below his mid-thigh, regularly lifting more than 20 pounds, or repetitively lifting more than 10 pounds.

Following these three diagnoses, Berger attempted to return to work, but his employer refused. He could not

perform his old job; nor did his employer have light work for him to perform. This was a problem: Berger couldn't pay for the surgery he needed to return to work, but he couldn't get the money he needed for the surgery unless he worked. Over the next few months, Berger was able to perform some light construction work and sought a position as a supervisor that would provide health insurance. But by July 2000, Berger's condition had gotten worse and he could no longer work at all. Berger visited Dr. Sakrison and received a second epidural steroid injection. He also revealed that he had been receiving hydrocodone from another doctor to deal with the pain. Dr. Sakrison soon prescribed Duragesic patches as well, which provided localized pain relief. With this regimen, Berger could work 2 to 2.5 days a week as an independent contractor and perform light labor. The patches soon lost some of their effectiveness, and by November 2000, Berger told Dr. Sakrison that he could barely work, having gone in only two days in the two weeks prior to his appointment.

Eventually, Berger settled his worker's compensation claim, and, in October 2001 he returned to Dr. Paul to inquire into surgery. A second MRI revealed that Berger's original condition had actually improved somewhat; his herniated disc did not stick out as far, and his spinal canal was not as narrow. But all did not come up roses. A CT scan revealed a "pars defect" between Berger's lowest lumbar vertebra (the bottom part of the spine, or L5) and his sacrum (the top part of the pelvis that connects with the spine). A "pars" keeps the vertebra in place, among other things. If it breaks (or has some other "defect"), the vertebra can slip, causing pain. Rather than immediately performing surgery, Dr. Paul recommended that Berger receive epidural steroid injections and, when these eventually proved ineffective, a discogram—an invasive (and painful) procedure in which a doctor injects dye into a

vertebral disc to test for pain and then takes an X-ray of the spinal column. The discogram revealed excruciating pain in a different part of Berger's back—L2-L3—but less pain in the part of his back that had originally bothered him—L4-L5.

Although Dr. Paul suggested in March 2002 that Berger undergo surgery to fuse the L4 and L5 vertebrae (and thus keep them from moving and causing pain), another doctor—Dr. Steven Weinshel—gave a second opinion a few months later and disagreed. In the first place, the pain had shifted to a different part of Berger's back. In addition, because of the pars defect, fusing L4 and L5 could cause instability further down his back and eventually require another surgery to fuse more vertebrae, which would further diminish Berger's mobility. Dr. Weinshel also noted that Berger had good strength, normal reflexes, positive leg movement in his left leg, and a normal gait. In light of all this, Dr. Weinshel recommended a conservative treatment to manage the pain, but not surgery.

Given his lack of insurance and hobbled finances, Berger did not undergo any further treatment. He returned to Dr. Paul in April 2003, who also recommended against surgery given possible future complications. Dr. Paul could not give Berger much advice as to what jobs he could or could not perform, stating in his findings that Berger would need a functional-capacity evaluation. But he did indicate after a lumbar spine questionnaire that Berger would likely miss more than three days of work per month.

In July 2003, Berger also visited a consulting physician for the Disability Determination Services, Dr. Dar Muceno. As part of his evaluation, Dr. Muceno considered the battery of tests that Berger had undergone since 1999—his discogram, MRIs, progress reports, and a neurological exam. After reviewing the medical records, Dr. Muceno determined that Berger had the residual functional capacity for no more than sedentary work.

In July 2004, Dr. Sakrison completed a lumbar spine questionnaire and opined that Berger should not work where he had to sit or stand continuously and where he could not stand when necessary. She also indicated that Berger would need to take several breaks each hour and would be absent from work more than three times a month. Dr. Sakrison wrote a letter to Berger's attorney to this effect, summarizing her treatment. But her letter had a caveat; she said that she had primarily monitored Berger's pain medications and did not have documentation of Berger's work capacity or work limitations.

### B. Procedural History

Berger had filed an application for disability in January 2002, and in October 2004 he had a hearing before an ALJ at the Social Security Administration. Berger testified at the hearing about his medical history, his back pain, treatment history, and the limitations that his condition had placed on his ability to work as a carpenter. He noted that he had performed odd jobs as an independent contractor, admitting that he had not always paid income taxes on his earnings. He also discussed physical activities that he performed in his personal life, such as mowing his parents' lawn or driving four hours to see his girlfriend.

A vocational expert, Edward Utities, also would testify during Berger's hearing. The ALJ asked Utities to opine on the jobs available to someone like Berger who could not use ropes or ladders, could not stoop, crouch, crawl or kneel except occasionally. Utities testified that given Berger's age, education and work experience, he could perform one of the 5100 bench assembly jobs available in Wisconsin and one of the 500 jobs available monitoring surveillance systems.

In a written decision, the ALJ denied Berger's request for disability benefits. The ALJ applied the five-step evaluation process required by 20 C.F.R. § 404.1520. Berger had shown that he had not engaged in "substantial gainful activity" since his injury and that his condition did constitute a "severe medically determinable physical . . . impairment," as required by steps one and two. And Berger could not engage in his "past relevant work" as a carpenter or construction worker, as required by step four.

But the ALJ concluded that the medical evidence did not show that Berger "m[e]t[ ] or equal[ed]" any SSA listings, and his application thus failed at step three. The ALJ went on to conclude that Berger had a residual functional capacity to perform sedentary work, meaning that he could "make an adjustment to other work"—assembly jobs and monitoring surveillance systems—and was not disabled based on the factors listed in step five. In so doing, the ALJ adopted Dr. Muceno's findings regarding Berger's medical condition and found that he was able to work if he did not sit for more than 6 to 8 hours a day, lift any more than 10 pounds occasionally, stand or walk any more than two hours in an eight-hour workday, use ropes, ladders or scaffolding, and did not stoop, crouch, or crawl. The ALJ rejected the opinions of Drs. Paul and Sakrison that Berger would have to miss more than three days of work per month. Both were unpersuasive in light of their "significant disclaimers," such as a statement by Dr. Paul that his conclusion was not based on a recent examination and Dr. Sakrison's statement that she did not have any documentation of a functional work capacity. Finally, the ALJ rejected Berger's testimony as not credible, characterizing his "complaints of disabling pain [as] inconsistent with his reports regarding his daily activities."

Berger appealed to the District Court for the Western District of Wisconsin. The case was assigned to a magistrate, Judge Stephen L. Crocker, who issued a comprehen-

sive written decision. Although he expressed "bemusement and displeasure with the manner in which the ALJ approached" the case, he ultimately recommended affirming the ALJ's decision. The district court adopted the magistrate's findings, and this appeal followed.

## II. Discussion

Berger raises two general issues on appeal. First, he argues that the ALJ misconstrued the medical evidence in making its residual functional capacity finding, whether by misinterpreting medical evidence or by giving too little weight to his treating doctors. Second, Berger challenges the ALJ's determination that he was not credible. The following sections discuss each issue in turn.

### A. ALJ's Evaluation Of The Medical Evidence

As mentioned, an ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits as required by 20 C.F.R. § 404.1520. Step three requires the ALJ to "consider the medical severity of [the] impairment[s]" to determine whether the impairment "meets or equals one of [the] listings in" appendix 1 of subpart P. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment rises to this level, he earns a presumption of disability "without considering [his] age, education, and work experience." *Id.* at § 404.1520(d). But if the impairment falls short, an ALJ must examine the claimant's "residual functional capacity"—that is, the types of things he can still do physically—to determine whether he can perform his "past relevant work," *id.* at § 404.1520(a)(4)(iv) (step four), or, failing that, whether the claimant can "make an adjustment to other work" given his "age, education, and work experience," *id.* at § 404.1520(a)(4)(v) (step five). The ALJ determined that Berger's impairment did not "meet[ ] or

equal[ ]" any of the listings in appendix 1. And because he could still perform sedentary work, he could "make an adjustment to other work" in either a bench assembly job or by monitoring surveillance systems, scotching his disability claim at step five. The short of Berger's appeal is that the ALJ erred in its interpretation of the medical evidence in reaching this conclusion.

In an appeal from the denial of social-security benefits, we are not free to replace the ALJ's estimate of the medical evidence with our own. Instead, we review the SSA's final decision for substantial evidence, 42 U.S.C. § 405(g), meaning that we ensure that the decision rests on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When an ALJ recommends that the agency deny benefits, it must first "build an accurate and logical bridge from the evidence to the conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade.

Berger is able to point to minor errors in the ALJ's reasoning. For example, the ALJ erroneously stated that Berger was not a candidate for surgery in 2001 because his condition at L4-L5 had "resolved" itself. In fact, the 2001 MRI revealed that the disc between Berger's L4-L5 vertebrae had improved somewhat, though not fully. And Drs. Paul and Weinshel recommended against surgery due to the risks of future degeneration, not Berger's recovery. The ALJ also said that the discogram showed that Berger had a "normal disc" at the L2-L3 vertebrae when in fact the previous MRI revealed that Berger had a small annular tear in that disc. These errors lend weight to the argument that the ALJ had not fully understood the medical evidence.

But these misreads prove to be outliers and do not indicate that the ALJ's decision lacked an adequate factual basis. The ALJ's job was to assess Berger's residual functional capacity by evaluating the "objective medical evidence and other evidence" to determine whether it was consistent with Berger's subjective statements regarding his impairment. 20 C.F.R. § 404.1529(a), (d)(3). The ALJ's assessment was entirely consistent with that offered by Dr. Muceno, the doctor for Disability Determination Services who examined Berger in July 2003. Dr. Muceno reviewed Berger's medical history, the MRIs, the results from the discogram, and the previous observations by his treating doctors. Based on all this, Dr. Muceno determined that Berger could "do no more than sedentary" work. Dr. Muceno's report was based on the objective medical evidence available at the time. It discussed Berger's "chronic low back pain syndrome" due to a "degenerative disc at L4-L5" and it stated that Berger had a "positive [straight leg raise] on the left and negative on the right." The report also set out the previous work evaluations and progress notes, which indicated that he "ambulated well," was "stiff when he got out of chair," and concluded that he was "capable of light" work. The ALJ credited the report's findings as being "consistent with the evidence of record regarding the claimant's objective medical findings and reported activities, and inconsistent with complete disability."

The ALJ also found support for Dr. Muceno's conclusions in the various medical tests undergone by Berger over the years. In December 1999, Berger underwent a functional-capacity evaluation, which showed that he was able to perform light work, including lifting 20 pounds occasionally and 10 pounds frequently. The ALJ credited this report and a January 2000 evaluation that reached the same conclusion. In addition, Dr. Sakrison's notes indicated that Berger had continued to do some work as a

carpenter, albeit not at a full-time level. The ALJ considered even this part-time carpentry work, which involved a medium exertional level, as proof that Berger could perform "well above the residual functional capacity" of sedentary work.

And the ALJ did discuss and dismiss that medical evidence tending to support Berger's claim, in particular the reports of Drs. Sakrison and Paul. An ALJ must only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). The ALJ certainly met this lax standard. He first rejected Dr. Sakrison's conclusions regarding Berger's functional capacity—specifically that Berger would miss at least three days of work per month and that he could not continuously sit, stand, or walk—by correctly noting that Dr. Sakrison had not, by her own admission, assessed his functional capacity. In addition, many of her observations regarding Berger's mobility and work history were simply inconsistent with his claims of debilitating back pain. The ALJ rejected Dr. Paul's assessment regarding missed work for the same reason. In fact, Dr. Paul expressly disclaimed any ability to accurately assess Berger's work restrictions because he had not done the requisite tests. Although Dr. Sakrison was Berger's physician for some time and Dr. Paul was a neursurgeon, *see* 20 C.F.R. § 404.1527(d)(2) & (d)(5) (listing these characteristics as deserving "more weight"), the ALJ showed that he was aware of the roles these doctors played in Berger's treatment, but he nonetheless decided to discount their medical opinions for the reasons listed above. This was not error. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("[T]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."). In short, the ALJ's opinion might not have been flawless, but it certainly rested on a sufficient factual basis to support its ultimate conclusion.

### B. ALJ's Determination That Berger Was Not Credible

Berger also challenges the ALJ's determination that he was not credible. The ALJ pointed to several inconsistencies when discounting Berger's credibility. Aside from his conclusion that the medical evidence did not support Berger's claims of debilitating pain, the ALJ pointed to several aspects of his testimony that, in his estimation, made Berger's claims less worthy of belief. For example, the ALJ found Berger's part-time work as a carpenter, the performance of household chores such as mowing the lawn, fishing, and the long-distance drives to see his girlfriend inconsistent with his claimed limitations. Also, Berger had failed to report some of his earnings on his income tax reports and had ostensibly engaged in drug-seeking behavior by getting hydrocodone prescribed by another doctor while Dr. Sakrison was treating him with a regimen of Vicodin and muscle relaxers. Finally, the ALJ questioned Berger's claims regarding his pain because he had failed to pursue physical therapy or other treatment options.

Some of the ALJ's findings regarding Berger's credibility are a bit harsh. For example, much of Berger's failure to pursue treatment can be explained by his lack of insurance coverage or money to foot the bills. Regardless, an ALJ's credibility assessment will stand "as long as [there is] some support in the record," *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007), and, in Berger's case, there was. The functional-capacity evaluation in 1999 and the evaluation conducted by Dr. Weiss in January 2000 indicated that Berger could perform light work. This evidence is inconsistent with Berger's statement that he was totally disabled. In addition, Berger continued to work as a carpenter, albeit on a part-time basis. Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform

some work cuts against his claim that he was totally disabled. So too do his statements regarding his non-work activities: four-hour drives, lawn mowing, cleaning out the garage, and light construction work indicate that Berger could perform sedentary work and was not rendered entirely immobile by his back pain. Finally, Berger had engaged in some behavior that undermined his credibility. He received a regimen of pain medication from two different doctors, and he failed to report income on his income taxes, either of which could justify a more skeptical view of his testimony. For these reasons, the ALJ's credibility determination was not "patently wrong," *Schmidt*, 496 F.3d at 842, or divorced from the facts contained in the record. Accordingly, we will not disturb his conclusion on appeal.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's decision affirming the Commissioner's denial of benefits.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*