NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 21, 2009
Decided April 28, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 08-3031

| | |
|---|---|
| PATRICK R. DAY, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Western District of |
| | Wisconsin. |
| *v.* | |
| | No. 07-CV-507 |
| MICHAEL J. ASTRUE, | |
| *Defendant-Appellee*. | Barbara B. Crabb, |
| | *Chief Judge*. |

**O R D E R**

Patrick Day suffers from pain in his lower right leg as a result of nerve damage sustained during surgery. In 2006 he applied for Social Security disability benefits, which an ALJ denied on the ground that Day's injury is severe but not disabling. After the Appeals Council denied review, Day sought judicial review in the district court, which upheld the ALJ. Day now appeals. Because the ALJ erred in disregarding the treating physicians' opinions and in assessing Day's credibility, we vacate and remand.

## Background

Day, who was 48 at the time of the hearing before the ALJ, had worked for nearly 19 years as an equipment operator for a road-paving company. In 2005 he injured his right calf on the job and underwent emergency surgery performed by Dr. Margaret Schwarze. Four days later, on September 10, Dr. Sandra Carr performed a second surgery due to complications from the first. Three days after the second surgery, Day was experiencing "very expressive pain," but Dr. Schwarze discharged him, believing that he could return to his "heavy manual labor job" within two months.

Over the next few months, however, Day continued to report significant pain and swelling in his lower right leg. On September 27, seventeen days after the second operation, Dr. Schwarze reported to Dr. David Jarvis, Day's primary physician, that Day had a mild infection in the wound, was not ambulating well, and was unable to put much weight on the right leg. Dr. Schwarze still predicted that Day would regain full function in six to eight weeks but conceded that it would be "hard to tell how quickly he will improve over time." On November 15, Dr. Schwarze opined that Day was "fully recovered" and ready to return to work, yet she also wrote in her progress notes that he should not "stand for more than 3-4 hours per day." Later in November, Day visited Dr. Jarvis and described the pain in his leg as "like a knife trying to pull my shin apart." He also told Dr. Jarvis that the pain was causing him to be depressed.

Day returned to Dr. Schwarze on December 27 complaining of "a burning pain" in his lower right leg that was causing him difficulty walking and keeping him awake at night. Although Dr. Schwarze raised the possibility that a major nerve in Day's right leg had been damaged during the first surgery, she reported to Dr. Jarvis that Day was "doing quite well" and that she could not understand why he had "significant pain problems." In February 2006, Day had a follow-up appointment with Dr. Jarvis, who noted that he was sleeping better but was still experiencing sharp pain and swelling. A week later Dr. Schwarze, noting that Day was "quite dissatisfied with my assessment of his leg," reiterated her assessment of his complaints and emphasized that it was important that he return to work.

On February 17, 2006, Day was evaluated at the University of Wisconsin Pain Clinic by Dr. Miroslav Backonja. Dr. Backonja, finding symptoms of chronic pain and depression, confirmed what Dr. Schwarze had proposed (and rejected) as the cause of Day's pain—a saphenous nerve injury. The diagnosis of right distal saphenous nerve causalgia, Dr. Backonja explained, meant Day could not return to his previous line of work because of the chronic nature and severity of the pain and associated symptoms. Dr. Backonja thus recommended that Day enroll in vocational rehabilitation and begin a physical-therapy

program.  On March 9, Day returned to Dr. Jarvis, reporting little change in his right leg. Dr. Jarvis, noting that Day's right leg continued to be sensitive even to a "light touch," agreed with Dr. Backonja's assessment.  "It is not realistic for [Day]," Dr. Jarvis wrote, "to go back to a similar job or any 8 hour job at this time."

At a follow-up appointment with the pain clinic one week later, Dr. Backonja went over Day's test results, which confirmed the injury to Day's saphenous nerve as large and small fiber dysfunctions in his lower right leg.  Dr. Backonja then recorded his opinion:

> [Day] was informed that from the perspective of chronic pain he should be deemed somebody who has disability related to the amputation of his lower extremity, either from below the knee or ankle level.  This statement is based on the fact that [Day's] symptoms exacerbate greatly with prolonged standing, as if he had a loss of part of the limb. . . .  At this point in time, based on what he can and cannot do, it is most realistic [Day] would be considered to be able to return to work with restrictions only to sedentary job.

An independent medical evaluation in April by a neurologist, Dr. Marc Novom, also diagnosed Day with saphenous nerve causalgia.  Dr. Novom noted that Dr. Schwarze had failed to ever acknowledge the calcification seen in an x-ray taken of Day's lower right leg, which might have assisted in her treatment decisions.  And Dr. Novom determined that Day would likely be confined to a sedentary status, perhaps indefinitely.

In May 2006, Dr. Jarvis completed a questionnaire in connection with Day's application for social security benefits, which Day had filed in March.  Dr. Jarvis opined that Day could not perform even sedentary work and must avoid all activities involving climbing, crouching, crawling, or kneeling.  Dr. Jarvis explained that Day's balance was unreliable and concluded that he could not work more than 17 hours per week.  Dr. Jarvis added, however, that as his pain control progressed Day might be able to work additional hours sometime in the future.

A month later, on June 13, 2006, Dr. Zhen Lu, a state-agency physician, reviewed Day's medical records and completed a Residual Functional Capacity assessment.  Dr. Lu, without any explanation, concluded that Day was capable of sedentary work with some exertional limitations.  Sylvester Foster, a state-agency reviewer, would echo Dr. Lu's conclusion without comment the following October.  Meanwhile, on June 19, a second state-agency physician, Dr. Kenneth Bauer, reviewed Day's medical records and concluded that his anxiety and depression were not severe.  That conclusion would also be upheld by yet another state-agency reviewer, Dr. Frances Culbertson.  Finally, on June 20 Day underwent a second RFC evaluation with a physical therapist on Dr. Backonja's referral.  The therapist

concluded that Day could sit 67 to 100 percent of a workday and stand 34 to 66 percent of a workday but had significant problems with walking, balancing, carrying, and lifting.

At a followup visit with Dr. Jarvis the next day, Day complained of intense pain and swelling because of the tests. Day also reported that he could not walk more than five blocks without sitting for 10 to 15 minutes and that he could not drive for more than an hour because of the severe pain in his lower right leg. At a subsequent examination on July 5, Dr. Jarvis wrote in his progress notes that Day had "worsening venous circulation in the lower leg" and uncontrolled Type 2 diabetes. Dr. Jarvis concluded that Day was incapable of sustained work, would need a part-time job at about four hours per day, and would unlikely be able to work five days per week. Two days later Janet Kunz, a nurse at the pain clinic, examined Day, who reported being able to walk up to five blocks, swim for about 15 minutes, and bike for approximately 10 to 12 minutes before the pain and swelling became unbearable. At first deferring to Dr. Backonja, Nurse Kunz found that Day could work in a sedentary setting at four hours per day with hourly breaks to change sitting positions.

On July 10, 2006, Dr. Jarvis wrote a letter to the Disability Determination Bureau on behalf of Day. Dr. Jarvis stated that Day had made all reasonable efforts at recovery but could not tolerate any sustained activity (including sitting) for more than an hour and could not carry more than five pounds of weight. Dr. Jarvis therefore concluded that Day could work at most four hours a day, but only "in interrupted portions to accommodate breaks as needed." Dr. Amy DeLong, who took over for Dr. Jarvis as Day's primary physician in late August, noted on October 2 that Day's chronic leg pain and depression were only worsening. Dr. DeLong referred Day to Nancy Pelonquin, a clinical social worker, who diagnosed Day as "Dysthymic if not suffering Major Depression due to the . . . loss of job and work function, loss of financial means, loss of spouse who recently left him, loss of lifestyle due to physical limitations."

On January 30, 2007, Day returned to Nurse Kunz, reporting sleeplessness and "a burning, sharp, aching pain" in his lower right leg. After examining Day, Nurse Kunz noted that Day's right tibia was cool to the touch and swollen. In April Dr. DeLong and Kandi Ryan, a nurse in Dr. DeLong's practice, joined Dr. Jarvis in writing a letter to the Disability Determination Bureau in support of Day's disability application. Both stated that Day had been unable to work or to sit and stand for any length of time because of chronic, debilitating leg pain.

At the hearing before the ALJ on April 17, 2007, Day testified that the pain in his leg averaged a seven or eight on a ten-point scale but could "go up to a ten very quick." He estimated that he could walk five blocks, sit for 45 minutes, and stand for about 25 minutes before the pain in his leg became too intense. Day also said that he needed to elevate his

right leg when seated and could "probably" lift, at most, ten pounds. Finally, Day testified that his right leg begins to swell whenever he is too active.

Jacquelyn Wenkman, a vocational expert, also testified at the hearing. Noting Day's past work experience, Dr. Wenkman considered jobs for a hypothetical person of Day's age, education level, and work experience. The ALJ instructed Dr. Wenkman to assume that the hypothetical person had an RFC to perform sedentary work, and was limited by the following: could not climb, crawl, or kneel; could occasionally bend, stoop, or crouch; and could not stand for more than 30 minutes. Responding to the ALJ's hypothetical, Dr. Wenkman testified that the person could perform various sedentary, unskilled jobs, including "assembly," "inspection," "attendant or monitor," "general office," and "information clerk." According to Dr. Wenkman, about 11,000 such jobs existed in the regional economy. Wenkman said that her testimony was consistent with the information in the Dictionary of Occupational Titles. Neither Day nor the ALJ asked Dr. Wenkman to cite specific job numbers from the DOT or to explain what data she relied upon in coming to her conclusions.

After the hearing the ALJ denied Day's claim for benefits. Although he found that Day suffered from post-traumatic saphenous neuralgia and dysthmia, the ALJ determined that Day's impairments did not meet or equal a listed impairment. The ALJ concluded that Day remained capable of performing "a range of sedentary work" such as general office jobs or information clerking positions. In reaching this conclusion, the ALJ found that Dr. Jarvis's May 2006 evaluation of Day was "not a persuasive opinion" because it failed to clearly outline "the connection between a lower leg injury and an inability to lift more than five pounds." The ALJ also reasoned that Dr. Jarvis's July 2006 determination that Day could work no more than four hours a day contradicted his earlier opinion "for no apparent reason." The ALJ rejected Day's testimony about his functional limitations as "not entirely credible" because, according to the ALJ, there was "no treating or examining source that has felt that he is incapable of performing sedentary work." The ALJ did acknowledge that Dr. DeLong and Nurse Ryan had found that Day was unable to sit or stand for any length of time, but without explanation the ALJ discounted their opinions as "unpersuasive."

The Appeals Council denied Day's request for review. The district court, calling it "a close case," upheld the decision of the ALJ. The court reasoned that the ALJ had properly evaluated the various medical opinions, drawn reasonable inferences from the evidence, and supported its RFC assessment with substantial evidence.

**Analysis**

Because the Appeals Council declined to review the ALJ's ruling, the ALJ's decision constitutes the final decision of the Commissioner of Social Security. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009). We review the district court's decision upholding the ALJ de novo, meaning we review the ALJ's ruling directly to determine whether it is supported by substantial evidence. *Id.* at 562; *see Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If an ALJ's decision "lacks adequate discussion of the issues," we will remand the case. *Villano*, 556 F.3d at 562.

Day raises several arguments, primarily that the ALJ failed to give the appropriate weight to Dr. Jarvis's opinion and refused, without explanation, to consider the opinions of Dr. DeLong and Nurse Ryan. He further contends that the ALJ erred by not fully crediting his testimony about his physical limitations. Day also argues that the ALJ failed to incorporate all of his limitations in the hypothetical given to the vocational expert.

Day is correct that the ALJ failed to give the appropriate weight to all of his treating physicians, including Dr. Jarvis, Dr. DeLong, and Nurse Ryan. A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R § 404.1527(d)(2); *see Moss*, 555 F.3d at 560; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). If an ALJ does not give the treating physician's opinion controlling weight, he must offer "good reasons" for explaining how much weight he has given the physician's medical opinion. 20 C.F.R § 404.1527(d)(2); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Here, Dr. Jarvis personally treated Day on March 9, 2006, following Dr. Backonja's discovery of the saphenous nerve injury in Day's lower right leg. Dr. Jarvis, agreeing with Dr. Backonja's assessment, found that Day's "[c]hronic right lower leg pain" made it unrealistic for him to "go back to a similar job or any 8 hr job at this time." Two months later Dr. Jarvis noted that, although he had advised Day to seek work in February prior to Dr. Backonja's evaluation, he had qualified that advice (as "pain control progresses") and could no longer recommend that Day do so because of the nerve injury. At an examination of Day in July, Dr. Jarvis confirmed these findings, noting that Day's medical condition "precludes any kind of sustained activity" and rendered him incapable of "sustained work."

The ALJ, however, discounted these opinions because he could not understand the connection Dr. Jarvis drew between Day's leg injury and his inability to lift more than five pounds. And he apparently thought that Dr. Jarvis's May opinion contradicted not only his

recommendations from the previous July, but also the medical opinions of the other doctors. But the ALJ never addressed, in accordance with Social Security regulations, whether Dr. Jarvis's opinions were supported by medically accepted clinical and laboratory diagnostic techniques. *See* 20 C.F.R § 404.1527(d)(2); *see also Moss*, 555 F.3d at 560-61; *Bauer*, 532 F.3d at 608. Moreover, the ALJ's rejection of Dr. Jarvis's opinion because of his own inability to understand the connection drawn by the doctor between Day's pain and his capacity to lift weight is nonsensical; rather than use his own confusion as a ground to reject the medical evidence, an ALJ is required to further develop the record if he cannot understand the evidence. *See, e.g.*, *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.").

The ALJ's decision that Dr. Jarvis had contradicted his earlier view and the opinions of Dr. Schwarze and Nurse Kunz also lacks support in the evidence. The ALJ wrote that Dr. Jarvis initially recommended sedentary employment but "for no apparent reason" altered his opinion two months later. Yet the two opinions largely track one another; both explicitly note that Day is incapable of full-time employment and list the various activities he should avoid. The only possible contradiction between the opinions—Dr. Jarvis's recommendation that Day seek a sedentary job—in fact referred to a February 7 evaluation made before Dr. Jarvis had access to Dr. Backonja's discovery. And, in any event, Dr. Jarvis had qualified his February progress notes with the phrase "[a]s pain control progresses," which in both May and July he made clear had not occurred to his liking. The ALJ also emphasized that Dr. Schwarze and Nurse Kunz had recommended that Day seek sedentary work. But Dr. Schwarze might not have accurately diagnosed Day's leg pain because, as Dr. Novom pointed out, she never saw the calcification of Day's right calf in her own x-rays. Nor did Dr. Schwarze ever have access to Dr. Backonja's later discovery. Further, the ALJ omitted an important qualification to Nurse Kunz's recommendation—that Day could engage in sedentary work only "at 4 hours per day with hourly brief breaks for change of position." This qualification was vital because a claimant unable to work full-time is considered disabled. *See* S.S.R. 96-8p; *see also Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008).

Even assuming that the ALJ offered "good reasons," *see* 20 C.F.R § 404.1527(d)(2), to discount Dr. Jarvis's opinion, such as substantial, inconsistent evidence, he did not consider the checklist of factors required by the Social Security regulations in order to determine the appropriate weigh to give Dr. Jarvis's opinion. *See Moss*, 555 F.3d at 561; *Bauer*, 532 F.3d at 608-09. The ALJ was right to point out several hopeful remarks concerning Day's ability to perform sedentary work, but not once did he point out the qualifications to these remarks, or explain why any of those observations deserved greater weight than the opinions of Dr. Jarvis, Dr. DeLong, Nurse Ryan, or Nurse Kunz. *See Moss*, 555 F.3d at 561; *Bauer*, 532 F.3d at 608-09. Nor did the ALJ ever offer any explanation for his refusal to give appropriate

weight to the medical opinions of Dr. DeLong and Nurse Ryan. By discounting the medical opinions of Dr. Jarvis without applying the correct legal standards, refusing to credit the opinions of Dr. DeLong and Nurse Ryan without explanation, and omitting a crucial qualification to Nurse Kunz's opinion, the ALJ failed to follow the relevant Social Security regulations and to support its decision with substantial evidence. *See Moss*, 555 F.3d at 561; *Bauer*, 532 F.3d at 608-09.

Day is also correct that the ALJ failed to support his conclusion that Day's testimony was not credible. Although we afford an ALJ's credibility finding "considerable deference" and will overturn it only if "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006), an ALJ cannot disregard a claimant's subjective testimony about disabling pain simply because a discernable cause for the pain does not stand out in the record, *Moss*, 555 F.3d at 561; *Villano*, 556 F.3d at 562. In determining a claimant's credibility, the ALJ must consider his level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R § 404.1529(c), and must justify its credibility finding with specific reasons, *Villano*, 556 F.3d at 562.

Here, the ALJ discounted the treating physicians' opinions and went on to conclude that Day's "statements concerning the intensity, duration, and limiting effects of [his leg injury] are not entirely credible" because he could do housework, attend movies, walk five blocks, sit for 45 minutes, stand for about 25 minutes, and was looking for a job. However, we have cautioned against placing undue weight on a claimant's household or outdoor activities, which the ALJ did here, in assessing his ability to work full-time. *See, e.g.*, *Moss*, 555 F.3d at 562; *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). In addition, the ALJ's vague, literalistic credibility finding completely ignored Day's testimony that he was barely able to walk five blocks without having to stop because his lower right leg begins to swell, and that his two young boys had been helping him with household chores. The ALJ also failed to seek an explanation for the perceived gap between Day's testimony and the available medical evidence, which would have vanished had there been a proper consideration of the treating physicians' medical opinions. *See Moss*, 555 F.3d at 562.

Accordingly, we VACATE the judgment of the district court and REMAND for further proceedings.