NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 10, 2009
Decided July 13, 2009

**Before**

ILANA DIAMOND ROVNER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

No. 09-1135

| | |
|---|---|
| PATRICK S. MULLIGAN,<br>*Plaintiff-Appellant*,<br><br>*v.*<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br>*Defendant-Appellee*. | Appeal from the United States District Court for the Western District of Wisconsin.<br><br>No. 08-cv-364-bbc<br><br>Barbara B. Crabb,<br>*Chief Judge*. |

## O R D E R

A terrible life-style choice caught up with Patrick Mulligan. In 2005, at the age of 41, he was diagnosed with lung cancer. This should come as no big surprise because Mulligan smoked two packs of cigarettes a day for the last 25 years. At one time, think post-World War II, smoking was glorified. Recall the appalling ad: "According to a recent National survey, more doctors smoke Camels than any other cigarette!" But in 1980, when Mulligan, at the age of 16, started lighting up, the warning signs were everywhere. Yet for whatever reason, he ignored them.

In 2005 Mulligan underwent surgery to remove malignant tissue. The surgery was difficult as one of his ribs was broken in the process. He subsequently contracted pneumonia. His post-operative chemotherapy exacted a toll as well, leaving Mulligan with short-term memory loss, peripheral neuropathy, leg pain, and drug-induced fatigue. That same year he applied for Social Security disability benefits and supplemental security income. He was partially successful. Following a hearing, an administrative law judge (ALJ) determined that Mulligan was disabled from February 5, 2005, to August 11, 2006, but not any longer. Mulligan's health had improved considerably since his surgery and chemotherapy, the ALJ reasoned, and his testimony regarding the severity of his impairments was not credible. The Appeals Council denied Mulligan's petition for review so the ALJ's decision became the final decision of the Commissioner of Social Security. Mulligan's petition for judicial review was denied by the district court and he is here today on an appeal filed in January of this year.

Mulligan, who was 42 years old at the time of the ALJ's decision, drove a truck for a living before he was diagnosed with lung cancer in February 2005. Two weeks after his diagnosis, Dr. Daniel Cavanaugh performed a lobectomy, surgically removing a cancerous lobe of Mulligan's right lung. But Mulligan developed pneumonia following surgery, and his doctors intubated him for approximately a week to stave off the illness. He was eventually discharged, in late February, with prescriptions for anti-bacterial medication and pain killers. Mulligan began chemotherapy treatment around this time, although that too came with complications; he was hospitalized, for example, two days into treatment because of severe nausea, heartburn, and vomiting. Mulligan's chemotherapy also caused peripheral neuropathy, manifest as numbness and pain in his feet and legs. Still, as Dr. Cavanaugh noted in March 2005, Mulligan was "doing very well" in light of his problems earlier that month, and his oxygen saturation rate--a measure of the amount of oxygen in the bloodstream--was 98%.

In April 2005 Mulligan saw his treating physician, Dr. Thomas Lundquist, and complained of chest tightness, wheezing, shortness of breath, and severe pain in his lower extremities ("which [Mulligan] rates at 8/10"). Significantly, Mulligan reported that his prescribed morphine and Percocet were "not touching the pain." So Dr. Lundquist responded with a new treatment regimen, including new drugs for the pain. That same month, Dr. Bilal Naqvi, who was overseeing the chemotherapy treatment, noted Mulligan's multiple sources of pain medication--Dr. Cavanaugh and Dr. Lundquist--and informed Mulligan that he "should get his narcotics prescribed by only one physician and he decided to get these from Dr. Lundquist." Dr. Naqvi also noted that Mulligan would be completely disabled and unable to work during the course of his chemotherapy treatment but that he should regain his strength within four to six weeks of the final treatment.

By July 2005 Mulligan completed his chemotherapy treatment. Dr. Cavanaugh reported that he was "doing fairly well now" and that "[h]e is interested in going back to work, if he can." But before Dr. Cavanaugh would authorize a return to work, he wanted to monitor Mulligan's pulmonary functions a little longer. For the time being, Dr. Cavanaugh provided Mulligan with a tentative back-to-work slip with half-time restrictions for the month of August 2005 and then full-time authorization beginning September 1, 2005. Further testing in late July, though, showed that Mulligan had greater restrictions than first anticipated. Dr. Cavanaugh noted that Mulligan's forced vital capacity--a measure of how much air one can exhale--was merely "2.13 liters, which is only 42% of predicted." Nor did that measure improve with bronchodilators. Dr. Cavanaugh expanded on Mulligan's limitations:

> The patient becomes very short of breath just walking up the stairs and walking outside. The patient is asking questions about going back to work. He is a truck driver, and I do not think he is qualified to drive a truck. He also has some problems with his memory since he had his chemotherapy.
>
> . . . .
>
> In my surgical opinion, I think the patient is disabled. I do not think he is going to be able to do the heavy type of work that he has done in the past. The patient is also working through Social Security. We have him now involved in the occupational health side of things. As stated, in my opinion, I do not think the patient is going to be able to do the type of employment that he has in the past with his lung function and with his extreme shortness of breath.

After Dr. Cavanaugh learned that Mulligan was seeking disability benefits, he referred him to Dr. Eric Carlsen, who specializes in physical medicine and rehabilitation, for an evaluation of Mulligan's residual functional capacity (RFC). Following a July 2005 examination, Dr. Carlsen echoed many of the same observations as had Dr. Cavanaugh, explaining that Mulligan "gets short of breath easily, even household distance ambulation and up or down stairs. He is also complaining of some numbness in his feet and hands and some short term memory problems." "Of course it is not Social Security's issue whether or not he could be gainfully employed at his former employer," Dr. Carlsen remarked,

> but whether he could be reasonably employed in his area in other types of capacity. I certainly think that would be fairly unlikely, given his current

> presentation, including chronic narcotic usage, severe dyspnea [shortness of breath] with exertion and some peripheral neuropathy. Functional capacity is most likely in the sedentary to l[i]ght range with allowances for change of position.

That opinion jibes somewhat with a brief letter dated September 26, 2005, from Dr. Lundquist--Mulligan's treating physician--in which he remarked that Mulligan "remains unable to work at this time."

A year later, in August 2006, Dr. Cavanaugh still had reservations about Mulligan's return to work. He wrote, in response to a request from Mulligan's counsel for a medical status report:

> Mr. Mulligan at the present time appears to slowly be recovering from his surgery. He complains of some pain in his feet secondary to his chemotherapy and that is being followed by his primary physician, Dr. Lundquist in Rice Lake. This is a chemotherapy-induced peripheral neuropathy. The patient is also being followed by his primary physician because of a chronic depression.
>
> . . . .
>
> In my opinion I think Mr. Mulligan has been disabled since his original thoracotomy in February 2005. His pulmonary status continues to improve. However, with exercise he becomes short-winded and his oxygen saturations do fall. It would be my opinion that as of this time, Mr. Mulligan is not able to maintain a full work load as he had prior to his surgery, and that if he was considered for some type of employment this would certainly have to be the type of work that would be modified to meet his needs from the residual pulmonary status secondary to his lobectomy.

Mulligan's counsel made the same request of Dr. Lundquist, who responded in September 2006. "Mr. Mulligan continues to have significant fatigue," wrote Dr. Lundquist. "He is unable to work for any long periods of time during the day without having to lie down." Dr. Lundquist mentioned that Mulligan was still taking narcotic pain medication for the "painful neuropathy" in his legs. And, although he gets short of breath with exertion, Mulligan was "not extremely hypoxemic"; that is, adequate oxygen was getting into his bloodstream.

After his initial application for Social Security benefits was denied, Mulligan requested a hearing before an ALJ. At the hearing in November 2005, the ALJ heard testimony from Mulligan, a medical expert, and a vocational expert. The ALJ concluded that Mulligan was not disabled. Mulligan appealed that determination, and in April 2006 the Appeals Council remanded the case to the ALJ because "[t]he hearing decision does not contain a specific finding regarding the credibility of the claimant's subjective complaints. In addition, the decision does not address whether the claimant has an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms alleged." "In particular," the Appeals Council continued "the decision does not address the claimant's allegation that he needs to lie down for one to three hours each day due to fatigue, which the vocational expert at the hearing indicated would preclude all work activity."

The same ALJ convened a second hearing in August 2006, again hearing testimony from Mulligan, a non-examining, state-agency physician (Dr. Katherine Hiduchenko), and a vocational expert (Paul Maulucci). Unfortunately, there is no transcript of the second hearing in the record. The parties acknowledge this deficiency but do not attempt to explain it. The district court, in its written decision, noted the problem as well but chose to draw on the ALJ's written summary of the hearing because neither party objected to that portion of the decision.

Following the hearing the ALJ concluded that Mulligan was disabled from February 5, 2005, to August 12, 2006. The ALJ began, at step one, by finding that Mulligan had not engaged in any substantial gainful activity since February 5, 2005. The ALJ concluded at step two that Mulligan suffered from the following severe impairments: "a history of undifferentiated adenocarcinoma [a type of cancer] of the right lung, status post right upper lobectomy, and chemotherapy, with residual moderate obstructive pulmonary disease, and chemotherapy-related sensory peripheral neuropathy in the lower extremities." Mulligan had also complained of a right-foot fracture, a history of gastroesophageal reflux disease, and left-shoulder inflammation, but the ALJ found that those conditions were not severe physical impairments. Similarly, the ALJ rejected Mulligan's claim that his depression rose to the level of a severe medically determinable mental impairment. There were few references to depression in the record, the ALJ remarked, and even those references--e.g., Dr. Cavanaugh noting that Dr. Lundquist was monitoring Mulligan's depression--did not provide any significant detail. The ALJ observed, moreover, that "the medical record documents no evaluation or treatment by any mental health provider." Perhaps most significant was Mulligan's tacit acknowledgment at the hearing that, although he was taking Prozac, he did not experience any symptoms of depression that might interfere with working.

Next, at step three, the ALJ concluded that from February 5, 2005, to August 11, 2006, Mulligan did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Still, during that period, as the ALJ noted at steps four and five, Mulligan lacked the residual functional capacity to perform even sedentary-level work. The ALJ synthesized the reports of Dr. Lundquist and Dr. Cavanaugh and concluded that they were consistent with the testimony of Dr. Hiduchenko, the non-examining, state-agency physician--who testified that during the 18-month period Mulligan "would have been unable to perform any work due to his required surgery, post-surgical and chemotherapy related complications, and prolonged recovery period."

The ALJ's written decision is incomplete, however. Under the bolded heading "12. Medical improvement occurred as of August 12, 2006, the date the claimant's disability ended (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i))"[*] the ALJ wrote only "**[EXPLAIN HOW SEVERITY OF IMPAIRMENTS DECREASED IN TERMS OF SIGNS, SYMPTOMS, AND/OR LABORATORY FINDINGS]**." This is obviously an oversight by the ALJ.

Elsewhere in his decision, however, the ALJ touches on this notion of medical improvement. For example, the ALJ writes that beginning in September 2006 "the claimant has had the residual functional capacity to perform sedentary to light level work" with certain environmental restrictions. In support of his RFC analysis, the ALJ also observes that "Dr. Cavanaugh, the claimant's treating surgeon, indicated on August 11, 2006, that the claimant's pulmonary status continued to improve, and that he would be able to perform work modified to meet his pulmonary status needs."

Also key to this notion of medical improvement is the ALJ's adverse credibility determination. The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible beginning on September 1, 2006." For instance, Mulligan testified about constant pain in his lower extremities and pressure in his lungs that prevented him from sitting or standing for more than an hour at a time or walking more than three blocks at a time. But the medical record, the ALJ reasoned, "documents only a moderate obstructive pulmonary defect, with

---

[*] Medical improvement, as defined in 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i), is "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)."

significant response to bronchodilator treatment." Compounding the ALJ's doubts was the fact that, despite medical expectations of improvement as early as 2005, Mulligan had reported no improvement, instead demonstrating "considerable narcotic seeking behavior . . . with the claimant specifically requesting Percocet from multiple providers for multiple sites of pain."

Mulligan again sought review before the Appeals Council, but this time his appeal was denied. As we have noted, the district court likewise upheld the decision of the ALJ on Mulligan's petition for judicial review.

If, as is the case here, the Appeals Council declines to review the ALJ's decision, that decision becomes the final decision of the Commissioner of Social Security. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Without deference to the district court, we probe the ALJ's decision to determine whether it is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.");*Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009).

Mulligan first proposes that the ALJ relied improperly on the testimony of Dr. Hiduchenko--a non-examining, state-agency physician--and erred by not giving controlling weight to the medical opinions of Dr. Lundquist--his treating physician. In doing so, Mulligan writes, the ALJ yielded to the temptation to play doctor. Mulligan knows well and repeats throughout his brief, a treating physician's opinion is entitled to controlling weight so long as it is supported by objective medical evidence and is consistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). An ALJ who discounts the opinion of the treating physician must articulate good reason for doing so. 20 C.F.R § 404.1527(d)(2); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Mulligan's argument has traction. The ALJ insists throughout his decision that he has given *all* of the medical reports "great weight," but that statement is misleading. So, too, is the ALJ's assertion that the medical record unequivocally supports Dr. Hiduchenko's opinion--that Mulligan was unable to work only after surgery, during chemotherapy, and during a "prolonged recovery period" ending in August 2006. Dr. Hiduchenko's opinion cannot be squared, for example, with Dr. Lundquist's continuing observations, first communicated in a January 2006 letter, that Mulligan has "excessive daytime fatigue" as a result of his chronic pain medication and "frequently has to lie down during the day." Dr. Lundquist reiterated these concerns in his September 2006 letter, explaining that "Mulligan continues to have significant fatigue. He is unable to work for

any long periods of time during the day without having to lie down." The ALJ chose not to countenance those restrictions because, as to the first letter, "Dr. Lundquist did not indicate that the claimant was required to lie down on a medical basis" and, as to the second letter, "Dr. Lundquist did not indicate any medical need to lie down for a specific period each day." The ALJ surmised further that Dr. Lundquist was merely parroting Mulligan's self-reporting. He wrote: "Although Dr. Lundquist has reported that the claimant lies down frequently throughout the day, these reports merely reiterate the claimant's subjective complaints, and are not consistent with specific medical limitations resulting from any severe impairment or treatment for any severe impairment." The medical need is crystalline, though: Mulligan's pain-management medication leaves him exhausted, as his treating physician noted as early as January 2006. The ALJ's faulty explanation for discounting a portion of Dr. Lundquist's opinion falls short of a "good reason," and that alone warrants a remand. *See* 20 C.F.R. § 404.1527(d)(2); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

But Mulligan's strongest argument concerns the ALJ's failure to explain the medical improvement, in August 2006, that purportedly eliminated Mulligan's disability. The ALJ obviously intended to include more under heading 12; the Commissioner concedes that point. Nevertheless, the Commissioner asks us to affirm because, on the whole, the ALJ's decision adequately addresses the medical improvement--or so goes the argument. We disagree. Medical improvement, as defined in 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i), is "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." We require, moreover, that an ALJ substantiate his assessment of a claimant's residual functional capacity, *see Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009), a process often referred to as "build[ing] an accurate and logical bridge from the evidence to the conclusion," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The only real discussion of improvement (in the relevant time frame) is a single line in the decision stating that "Dr. Cavanaugh, the claimant's treating surgeon, indicated on August 11, 2006, that the claimant's pulmonary status continued to improve, and that he would be able to perform work modified to meet his pulmonary status needs." The August 2006 letter the ALJ cites is not so rosy, however; Dr. Cavanaugh also talks about the "slow[] recover[y]" from surgery and Mulligan's tendency to become short-winded with exercise ("and his oxygen saturations do fall"). Furthermore, Dr. Cavanaugh's ultimate conclusion is more equivocal than the ALJ suggests. He writes, "as of this time, Mr. Mulligan is not able to maintain a full work load as he had prior to his surgery, and . . . if he was

considered for some time of employment, this would certainly have to be the type of work that would be modified to meet his needs from his residual pulmonary status secondary to his lobectomy." What is more, Dr. Lundquist's September 2006 letter--which, again, the ALJ chose to discount for lack of medical basis--suggests *continuity* of Mulligan's earlier symptoms, not improvement. It says, "The information contained in the letter dated January 25, 2006 is still pertinent. Mr Mulligan continues to have significant fatigue. He is unable to work for any long periods of time during the day without having to lie down."

Here, the ALJ fell short of what was required. The absence of any actual analysis under header 12 is alarming--and the notation "**[EXPLAIN HOW SEVERITY OF IMPAIRMENTS DECREASED IN TERMS OF SIGNS, SYMPTOMS, AND/OR LABORATORY FINDINGS]**" is not nearly enough. Nor are the selective references to passages from medical professionals who believe only that Mulligan has improved since his worst days and someday may be able to work, albeit in a limited fashion.

Finally, we note Mulligan's contention that the ALJ failed to properly investigate and analyze his complaints of depression. On the contrary, the ALJ devoted a sizable paragraph to the possibility that a mental impairment contributed to Mulligan's disability. But the ALJ observed that the only medical evidence of depression in the record was Dr. Cavanaugh's note that Dr. Lundquist (a physician, not a mental-health practitioner) was monitoring Mulligan's depression. Dr. Lundquist never mentioned it in his reports. Other than that, Mulligan mentioned at the hearing that he was taking Prozac, "but reported no symptoms of depression that would interfere with his ability to work." Mulligan concedes that there was scant evidence of his depression in the record but counters that, once on notice, the ALJ was somehow obligated to order additional tests, *see* 20 C.F.R. § 404.1517, and develop a fuller record as to his mental health. For that conclusion, he depends largely on cases that discuss the heightened duty an ALJ has to *unrepresented* claimants. *See generally Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Certainly a Social Security claimant is entitled to a full and fair record, *see id.*, but a claimant represented by counsel, as Mulligan was, is presumed to have made his best case before the ALJ, *see Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

Because we conclude, among other things, that the finding of a medical improvement was not based on substantial evidence, the ALJ's decision is **VACATED** and the matter is **REMANDED** to the agency for further proceedings.